# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DANIEL SLAUGHTER,        :

     Plaintiff,          :

   vs.                   :

MICHAEL J. ASTRUE,      :
Commissioner of the Social
Security Administration,     :

     Defendant.       :

Case No. 3:09cv00233

District Judge Walter Herbert Rice
Magistrate Judge Sharon L. Ovington

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Daniel Slaughter brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). This Court has jurisdiction to review the final administrative denial of his applications. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. #14), the administrative record, and the record as a whole.

Plaintiff asserted during the administrative proceedings that he was eligible to receive DIB and SSI because he was under a "disability" within the meaning of the Social Security Act. In the present case, Plaintiff seeks an Order reversing the ALJ's decision and granting him benefits. Or, in the alternative, Plaintiff seeks a remand under Sentence

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Six of 42 U.S.C. §405(g) due to the existence of new and material evidence.

The Commissioner contends that an Order affirming the ALJ's decision is warranted.

## II.   Background

### A.   Procedural History

Plaintiff protectively filed[2] his SSI and DIB applications on July 26, 2006 asserting that he was under one or more disabilities due to an "artificial aortic valve, pigeon breast, bad left foot bone, Chronic Obstructive Pulmonary Disease, spinal stenosis, lower lumbar bone spurs rt. [right], calf blood problems, Social Problems, Depression, Anxiety, [and] anemia."  (Tr. 109; *see* Tr. 87-89, 93-95).  Plaintiff also asserted that beginning on September 15, 2005, his disabilities prevented him from engaging in any substantial gainful employment.

Following initial administrative denials of his applications, Plaintiff received a hearing before Administrative Law Judge (ALJ) David A. Redmond.  ALJ Redmond later issued a written decision concluding that Plaintiff was not under a disability and not eligible to receive DIB or SSI.  (Tr. 11-23).  ALJ Redmond's decision is at issue in the present case.

### B.   Plaintiff's Vocational Profile and Testimony

Plaintiff's age (forty-three) on his alleged disability onset date placed him in the category of a "younger individual" for the purpose of resolving his DIB and SSI applications.  *See* 20 C.F.R. §§404.1563; 416.963[3]; *see also* Tr. 21.  Plaintiff earned high

---

[2]  A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits.  It may be used to establish an earlier application date than the date the Social Security Administration received the claimant's signed application.  *See* http://www.ssa.gov/glossary.

[3]  The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

school equivalency diploma.  His employment has included work as a welder and a heat treater.  (Tr. 110, 115).

During the administrative hearing, Plaintiff testified that he is single and has no dependent children.  (T. 27-28).  He lives in a group home for people with mental health issues.  (Tr. 28).  Before living in the group home he slept in his brother's garage for about six months, then he lived in a homeless shelter.  *Id.*

Plaintiff does not have a driver's license due to an accident seven years earlier, and he cannot afford the license reinstatement fee.  *Id.*

Plaintiff testified he stopped working in September 2005 because his doctor advised him to seek other employment due to his lung problems.  (Tr. 29).  Plaintiff stated that he has "emphysema and peripheral emphysema in the upper left lobes and [has] welder's lung in the bottom of [his] lungs...."  (Tr. 29).  Plaintiff smokes about nine or ten cigarettes a day.  (Tr. 33).

Plaintiff further explained that he cannot work due to his lack of social skills, bipolar disorder, back problems, breathing problems, foot problems, leg edema and varicose veins, and pain in the small of his back and in his buttocks and legs.  (Tr. 30-31).  Plaintiff takes approximately thirteen medications per day and uses two inhalers.  (Tr. 30).

Plaintiff estimated that he could walk one city block and be on his feet approximately forty minutes.  (Tr. 32-33).  He has trouble sitting and cannot lift more than twenty pounds.  (Tr. 32).

### C.  Medical Evidence

The administrative records contains, in part, the following pertinent medical evidence.  For additional description, see Doc. #10 at 2-6 and Doc. #13 at 2-11.

### 1.
### Evidence:  Pre-Disability Onset Date

In April 2003, more than two years before Plaintiff's asserted disability began, he

underwent an aortic valve replacement surgery. (Tr. 187-88). He recovered well over the next several months. *See* Tr. 161. His cardiac test results in July and August 2003 were essentially normal. (Tr. 294-95).

In August 2003 Plaintiff's surgeon, Dr. Misick, reported that Plaintiff's recovery was "excellent." (Tr. 162-63). But Dr. Misick further reported that Plaintiff complained of leg pain related to "bilateral engorged varicose veins." (Tr. 161). Upon examination, Dr. Misick observed notable varicose veins yet no evidence of thrombosis. *Id*. Dr. Misick recommended vein stripping, which Dr. Sprier performed on Plaintiff's right leg in November 2003. (Tr. 160, 162). Dr. Spier noted that Plaintiff's legs looked "fairly good" in December 2003. (Tr. 200).

In November 2003 Plaintiff underwent an electrocardiogram with cardiologist Dr. Mohammed. The results were essentially normal. (Tr. 292).

On November 11, 2003, psychologist Dr. Schulz examined Plaintiff upon request from the Ohio Bureau of Disability Determinations (Ohio BDD). (Tr. 365-71). Dr. Schulz diagnosed Dysthymia and Antisocial Personality Disorder. (Tr. 370). Dr. Schulz opined that Plaintiff was moderately impaired in two areas: his mental ability to relate to others, including coworkers and supervisors, and his mental ability to withstand the stress and pressure associated with day-to-day work activity. (Tr. 371).

In December 2003 Dr. Norris reviewed Plaintiff's records at the request of the Ohio BDD. Dr. Norris opined that Plaintiff was capable of performing light exertional level work. (Tr. 389-394).

Plaintiff went to the emergency room on July 7, 2004 due to left-sided chest pain and was admitted into the hospital. (Tr. 201). An echocardiogram revealed a pericardial effusion but did not show any other acute changes. (Tr. 201). Chest x-rays did not show any infiltrates. (Tr. 201). Plaintiff underwent a Holter monitor study, which showed episodic sinus tachycardia. (Tr. 283). A physician also noted that during his admission he was "profoundly depressed...." (Tr. 201). Plaintiff was discharged from the hospital

on July 11, 2004.  (Tr. 202).

In January 2005 Plaintiff reported to Dr. Mohammed that he had been having chest pain.  (Tr. 282).  In late January 2005 Plaintiff underwent an echocardiogram, which showed a normal left ventricle and a mildly dilated right ventricle.  (Tr. 281).

Plaintiff went to the emergency room in late February 2005 due to a persistent postdural puncture headache.  (Tr. 206).  A CT brain scan was negative.  (Tr. 206).  Plaintiff had no neurological deficits on examination, but he was admitted to the hospital.  (Tr. 209).  He was discharged two days later.  (Tr. 206).  In late February 2005 Plaintiff underwent an adenosine cardiolite stress test, which was essentially normal.  (Tr. 280).

On July 28, 2005, Plaintiff went to the emergency room with chest pain.  (Tr. 217).  Upon examination, his heart rate and rhythm were regular.  (Tr. 220). His prosthetic valve had a normal murmur in the aortic area.  (Tr. 220).  An electrocardiogram "was unremarkable."  (Tr. 217).  The admitting physician "suspect[ed] muscular pain as the etiology of his chest pain."  (Tr. 220).  He was prescribed medication and discharged from the hospital one day later in stable condition.  (Tr. 217-18).

## 2.
## Opinion Evidence: Post-Disability Onset Date

**Dr. Jawadi**   In February 2006 Dr. Jawadi saw Plaintiff for the first time and completed a basic medical form.  (Tr. 571-73).  Dr. Jawadi believed that Plaintiff was limited to standing and/or walking for two to three hours total in an eight-hour workday but he could sit without restriction.  Dr. Jawadi further believed that Plaintiff could lift and carry up to five pounds occasionally and was extremely limited with respect to pushing/pulling, bending, and repetitive foot movements but was not significantly limited in reaching or handling.  Dr. Jawadi checked boxes indicating his opinion that Plaintiff would be "unemployable" from thirty days to nine months.  (Tr. 573).

**Psychologist Dr. Tanley**   In September 2006 Plaintiff underwent a psychological evaluation with Dr. Tanley at the request of the Ohio BDD.  (Tr. 296-298).  Dr. Tanley

diagnosed Plaintiff as having an adjustment disorder with depressed mood and noted this was "chronic." (Tr. 298). Dr. Tanley opined that Plaintiff's ability to relate to others, understand and follow simple instructions, and maintain attention to perform simple, repetitive tasks was unimpaired. (Tr. 298). Dr. Tanley further opined that Plaintiff had a moderate limitation in withstanding the stress and pressure of daily work. (Tr. 298).

**Psychologist Dr. Tishler**     In October 2006 Dr. Tishler reviewed Plaintiff's records at the request of the Ohio BDD. (Tr. 300-318). Dr. Tishler checked a box on a form indicating that Plaintiff had an affective disorder. (Tr. 305). He also checked boxes indicating that Plaintiff had a moderate limitation on his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 302). Dr. Tishler opined that Plaintiff had mild limitations in activities of daily living; mild limitations in maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace. (Tr. 315). Dr. Tishler believed that Plaintiff had experienced one or two episodes of decompensation each of extended duration. *Id*. Dr. Tishler noted that Plaintiff was capable of performing routine, one and two-step tasks (Tr. 303).

**Dr. Padamadan**     In November 2006 Plaintiff underwent a physical examination with Dr. Padamadan at the request of the Ohio BDD. (Tr. 319-26). Dr. Padamadan recognized that Plaintiff had undergone an aortic valve replacement in 2003. (Tr. 319). Upon examination, Dr. Padamadan heard an audible prosthetic click from Plaintiff's aortic valve replacement. (Tr. 321). Plaintiff had a full range of motion throughout his upper and lower extremities, and his sensory and neurological functions were normal. *Id*. Dr. Padamadan diagnosed Plaintiff with status post aortic valve replacement "on anticoagulation with Wafarin," a history of Chronic Obstructive Pulmonary Disease "without any functional impairment," low back pain and history of spinal stenosis, and a "[h]istory of depression on Lexapro and Trazodone." (Tr. 322).

Dr. Padamadan opined that based upon his clinical evaluation and the absence of

objective findings of any functional impairment, he did not see any indication for limiting Plaintiff's physical activities except for a physiological restriction for his status post aortic valve replacement and his anticoagulation medications.  *Id.*

**Dr. Villanueva and Dr. Derrow**    In December 2006 Dr. Villanueva reviewed the record for the Ohio BDD.  (Tr. 327-34).  According to Dr. Villanueva, Plaintiff could perform medium work[4] except he could not balance and could not be exposed to extreme cold or heat or to fumes, odors, dusts, gases, or poor ventilation.  (Tr. 328-29, 331).

As will be seen, one of Plaintiff's main contentions in the present case is that the ALJ erred by not obtaining an updated medical opinion because Dr. Villanueva could not have reviewed Plaintiff's later lumbar MRI done on March 6, 2007.  This MRI showed a "[b]road posterior disc protrusion at L5-S1 asymmetric to the left measuring nearly 5mm in AP dimension with an area of high T2 signal annular fissuring.  The disc protrusion abuts the traversing S1 nerve root and could be a means irritation of the left S1 nerve root."  (Tr. 443).

On April 13, 2007, Dr. Derrow noted that he had reviewed all of the evidence in the administrative file and that he agreed with Dr. Villanueva's assessment.  (Tr. 341).

**Ms. Thomas**    In November 2007 Ms. Thomas, Plaintiff's case manager through Mental Health Services for Clark and Madison Counties, indicated in a Mental Impairment Questionnaire that she saw Plaintiff weekly, as needed.  (Tr. 445-48).  Ms. Thomas opined that based on Plaintiff's diagnoses of Bipolar Disorder, mixed, without psychotic features, and antisocial traits, his attention and concentration were fair to poor. (Tr. 445) .  Ms. Thomas also opined that Plaintiff would have moderate restriction in his activities of daily living; moderate difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence, or pace.  (Tr. 447).  Ms.

---

[4]  Under the Regulations, "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...."  20 C.F.R. §404.1567(c).

Thomas further reported that Plaintiff had three episodes of decompensation within a twelve-month period with each episode lasting at least two weeks. *Id.* According to Ms. Thomas, Plaintiff would miss more than four days of work per month as a result of his impairments or treatment. (Tr. 448).

### D. Plaintiff Submitted Evidence To The Appeals Council

ALJ Redmond held Plaintiff's administrative hearing on January 18, 2008 and issued his decision September 29, 2008.

Plaintiff appealed the ALJ's decision to the Social Security Administration's Appeals Council. He submitted additional evidence to the Appeals Council covering the time period from February 2008 to September 2008. *See* Tr. 4; *see also* Tr. 581-638. Plaintiff's additional evidence shows, in part, the following.

On February 12, 2008, Plaintiff suffered an acute subdural hematoma in a motor vehicle accident. Dr. Eichert performed a right parietal craniotomy to evacuate the hematoma. Plaintiff subsequently did well in recovery. On February 28, 2008, he was discharged from the hospital to an extended-care facility "for further therapies." (Tr. 608-09).

A CT of Plaintiff's brain taken on March 10, 2008 showed some maturation of the right subdural hematoma and decreased edema in the right parietal lobe. (Tr. 588). Dr. Eichert noted that Plaintiff's extraocular movements were full, his speech was clear, and he did not have focal weakness, gait asymmetry, or upper extremity drift. (Tr. 582).

Plaintiff's brain CT on March 31, 2008 showed significant interval decrease in the amount of right subdural hemorrhage. (Tr. 587). Plaintiff reported to Dr. Eichert that he felt good and that his headaches were improving, but he still had mild memory problems. Examination revealed that Plaintiff's gait was symmetric and that his extraocular movements were intact. (Tr. 583). Dr. Eichert instructed Plaintiff to resume his anticoagulant medications.

Plaintiff's brain CT on May 1, 2008 showed an encephalomalacia/ischemic/gliotic

changes involving the right frontoparietal junction region. (Tr. 585). On Plaintiff's follow-up visit, Dr. Eichert characterized the results of this CT as "normal" and noted that Plaintiff's headaches "are resolved." (Tr. 584). Dr. Eichert released Plaintiff from his care without restrictions. *Id*.

Plaintiff underwent an echocardiogram in May 2008, which showed mild to moderate mitral and tricuspid regurgitation, mild pulmonary hypertension, and mild aortic insufficiency. (Tr. 594).

Dr. Sutter, Plaintiff's treating primary care physician, saw him on June 11, 2008. (Tr. 598-99). Following an examination, Dr. Sutter completed a basic medical form opining that Plaintiff could lift or carry up to five pounds frequently and ten pounds occasionally; could sit for one hour total; and could stand/walk for one hour total. (Tr. 596). Dr. Sutter also believed that Plaintiff had marked limitations in pushing/pulling and bending/reaching, had moderate limitations in repetitive foot movements, and no significant limitations in handling. *Id*. Dr. Sutter concluded that Plaintiff was unemployable for a period of one year or more. (Tr. 596).

The report concerning a CT scan of Plaintiff's lumbar spine on August 21, 2008 revealed the following:

> No spinal stenosis. There is evidence for left L4 neural foraminal stenosis. Moderate disc bulging at the level of L5-S1 and there may be a superimposed small central disc protrusion contacting the S1 nerve roots. However, this cannot be stated with certainty. An MRI of the lumbar spine is suggested for further evaluation of this, as this is a much more sensitive examination for soft tissue abnormalities.

(Tr. 601).

On September 19, 2008, Dr. Balturshot saw Plaintiff for a neurological consultation upon referral from Dr. Sutter. (Tr. 603). Plaintiff reported low back pain radiating into both buttocks with jolts of stabbing pain down his left leg. *Id*. He informed Dr. Balturshot that this "has progressed for many years." *Id*. Upon examination by Dr.

Balturshot, Plaintiff's motor strength was full in all muscle groups and his tone, coordination, gait, and station were all normal. (Tr. 602). His sensation was grossly intact, his deep tendon reflexes showed no reflex pathology. There was no cranial nerve deficits. *Id*.

Dr. Balturshot reviewed the report from Plaintiff's August 21, 2008 lumbar spine CT scan and diagnosed Plaintiff with L4-L5 and L5-S1 degenerative disc disease. (Tr. 602-03). As to his treatment options and plan, Dr. Balturshot explained:

> Mr. Slaughter gives some mild history of a degenerative disc, mainly at L5-S1, with some left S1 foraminal encroachment. I really would like to do an MRI scan on him.... I will also get an EMG of the left lower extremity. I will order these and see him back to discuss options....

(Tr. 602). The administrative record in this case does not contain reports from the MRI or EMG Dr. Balturshot intended to order.

## III. <u>Administrative Review</u>

### A. <u>"Disability" Defined</u>

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

## B.    ALJ Redmond's Decision

ALJ Redmond resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations.  *See* Tr. 11-23; *see also* 20 C.F.R. §416.920(a)(4).  His pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff had the following severe impairments: "lumbar spinal stenosis, residuals of aortic valve replacement surgery, chronic obstructive pulmonary disease, adjustment disorder with depressed mood, and personality disorder."  (Tr. 14).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner Listing of Impairments.  (Tr. 16).

At Step 4 the ALJ concluded that Plaintiff retained the residual functional capacity to perform light work[5] but must be allowed to get off his feet for fifteen minutes every hour, and he must work in a temperature-controlled environment.  (Tr. 17).  The ALJ found that Plaintiff's mental impairments limited him to jobs involving simple tasks with minimal personal contact and no productions quotas.  *Id*.  The ALJ also found at Step 4 that Plaintiff was unable to perform his past relevant work.  (Tr. 21).

At Step 5 the ALJ concluded that Plaintiff could perform a significant number of jobs existing in the national economy.  (Tr. 22).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.  (Tr. 11-23).

## IV.    Judicial Review

---

[5]  The Regulations define light work as involving the ability to lift " no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §416.967(b).

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – determining whether the ALJ applied the correct legal standards – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

V.    **Discussion**

A.    **Medical Source Opinions**

**1.**

Plaintiff contends that the ALJ failed to properly evaluate the opinions of Dr. Jawadi, Dr. Padamadan, Dr. Villanueva, and Ms. Thomas as required by 20 C.F.R. §§404.1527(d), 416.927(d), and Social Sec. Ruling 06-03p, 2006 WL 2329939.

The Commissioner maintains that the ALJ reasonably rejected the opinions provided by Dr. Jawadi and Ms. Thomas, and properly credited the opinions of Drs. Villanueva, Derrow, and Padamadan.

**2.**

Social Security Regulations and case law require ALJs to apply controlling weight to a treating medical source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *See* 20 C.F.R. §404.1527(d)(2); *see also Rabbers*, 582 F.3d at 660; *Rogers*, 486 F.3d at 242; *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If a treating medical source's opinion is not entitled to controlling weight, it must be weighed under "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242.

More weight is generally placed on the opinions of examining medical sources than on the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). Yet the opinions of non-examining state agency medical sources have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Sec. Ruling 96-6p 1996 WL 374180 at *2.

Yet ALJs may not blindly or automatically credit the opinions of state agency medical sources or other non-treating sources; their opinions "can be given weight only insofar as they are supported by evidence in the case record." *Id*. The Regulations thus require ALJs to evaluate the non-treating physicians' opinions under the factors of supportability, consistency, specialization, and other factors brought to the ALJ's attention. *See* 20 C.F.R. §404.927(d)(3)-(6), (f); *see also* SSR 96-6p at *2-*3. The Regulations appear to emphasize this requirement by reiterating it no less than three times. *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); SSR 96-6p, 1996 WL 374180 at *2 (same).

### 3.

Plaintiff contends that the ALJ erred by providing little support for his decision to reject Dr. Jawadi's opinions. Plaintiff also argues that while the ALJ mentioned the findings of Drs. Padamadan and Dr. Villanueva, he gave no indication of the amount of weight he placed on their opinions.

A review of the ALJ's decision reveals that he correctly described the legal criteria applicable to determining whether a treating physician's opinion is due controlling weight. *See* Tr. 17. The ALJ also correctly stated that when a treating physician's opinion is not entitled to controlling weight, the opinion might still be entitled to deference. *See id*. The ALJ then explained that to determine whether such deference applies, he must continue to weigh the treating physician's opinions under the remaining regulatory factors. *See* Tr. 17-18. In this manner, the ALJ correctly described the legal criteria applicable to the evaluation of a treating physician's opinions. *See id*.; *see also* 20 C.F.R. §404.1527(d)(2)-(6).

The ALJ applied the correct legal criteria to Dr. Jawadi's opinions and substantial evidence supports his application. The ALJ declined to give controlling weight to Dr.

Jawadi's conclusions as "neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record." (Tr. 18). A review of the brief (three-page) basic medical form Dr. Jawadi completed confirms the ALJ's assessment. Dr. Jawadi did not describe the clinical or diagnostic techniques or evidence supporting his opinions, and he did not provide any meaningful explanation in support of his opinions. *See* Tr. 571-73.

The ALJ then continued to weight Dr. Jawadi's opinions as the Regulations require by applying the factors of supportability and consistency to his opinions. *See* Tr. 18; *see also* 20 C.F.R. §404.1527(d)(3)-(4) and Social Sec. Ruling 06-03p, 2006 WL 2329939. Substantial evidence supports the ALJ's application of these factors. The most significant information about Plaintiff's work limitations provided by Dr. Jawadi appears through his check-marks in certain categories of limitations without any supporting explanation. *See* Tr. 573. This most significantly appears in the space on the form asking, "What observations and/or medical evidence led to your findings...?" *Id*. Rather than providing specific or meaningful information, Dr. Jawadi merely wrote, "[___] I saw him for the first time on 2-7-06."[6] (Tr. 573). This was the same day Dr. Jawadi completed the basic medical form. The ALJ correctly recognized and considered this fact when discounting Dr. Jawadi's opinions, *see* Tr. 18, and the record lacks any indication that Dr. Jawadi saw Plaintiff before this date.

Instead of relying on Dr. Jawadi's opinions, the ALJ credited the opinions of Dr. Padamadan and Dr. Villanueva. *See* Tr. 18. Contrary to Plaintiff's contention, the ALJ's decision sufficiently indicates the weight he placed on opinions of Drs. Padamadan and Villanueva because the ALJ applied more weight to their opinions than he applied to Dr. Jawadi's opinions. *See* Tr. 18. This was not error. *See* SSR 96-6p, 1996 WL 374180 at *2 (characterizing state agency and other program medical sources "as highly qualified

---

[6] An unintelligible word appears at the start of Dr. Jawadi's sentence. *See* Tr. 573.

physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."). In addition, Dr. Villanueva provided a more cogent explanation than Dr. Jawadi in support of his opinions about Plaintiff's exertional limitations. *See* Tr. 328-29. Additionally, Dr. Padamadan's consultative physical examination suggests that Dr. Jawadi's opinions were out of proportion to the evidence. Upon Dr. Padamadan's examination, Plaintiff had a full range of motion throughout his upper and lower extremities, and his sensory and neurological functions were normal. (Tr. 321). And Dr. Padamadan also explained that there were no findings to suggest Plaintiff needed physical limitations, except for physiological restrictions related to his aortic valve replacement. (Tr. 322).

Turning to the opinions of Ms. Thomas, the ALJ correctly recognized that she was not an "acceptable medical source" as defined by the Regulations. *See* Tr. 17-18; *see also* 20 C.F.R. §404.1513(a). The ALJ, moreover, considered Ms. Thomas' opinions as the Regulations required, *see* §404.1513(d), by applying the supportability factor. This appears in the ALJ's rejection of Ms. Thomas' opinion – specifically, that Plaintiff had experienced three episodes of decompensation of at least three weeks duration – as unsupported by any evidence in the record. *See* Tr. 18-19. The ALJ also did not err by discounting Ms. Thomas' opinions based on her educational status (bachelor's degree) since this status tended to show a fairly low level of specialization, a proper consideration under 20 C.F.R. §404.1527(d)(5).

Accordingly, the ALJ applied the correct legal criteria when evaluating the medical source opinions of record and substantial evidence supports the ALL's evaluation of those opinions.

### B.    Updated Medical Opinion

Plaintiff contends that the ALJ committed reversible error by not obtaining an updated medical opinion as required by Social Security Ruling 96-6p. He reasons that Dr. Villanueva's opinions were not based on the entire record because Dr. Villanueva

reviewed the record on December 2, 2006, several months before Plaintiff underwent a lumbar spine MRI on March 6, 2007. Plaintiff emphasizes that the MRI showed a "broad posterior disc protrusion at L5-S1 ... *abbutting the traversing left S1 nerve root.*" (Doc. #10 at 10) (citing Tr. 442-43)(Plaintiff's emphasis).

Plaintiff does not contend that he asked the ALJ to obtain an updated medical opinion before or during the administrative hearing. A review of the transcript from the administrative hearing reveals that counsel informed the ALJ that the record was complete. (Tr. 26-27). There is, consequently, no written decision or explanation by the ALJ for the absence of an updated medical opinion. Regardless, Plaintiff has not shown that the ALJ committed reversible error.

At Step three of the sequential evaluation, Ruling 96-6p requires ALJs and the Appeals Council to obtain an updated medical opinion in only two situations:

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council, the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

1996 WL 374180 at *4. Plaintiff's arguments arise under the second situation because he relies on additional medical evidence – the March 6, 2007 MRI (Tr. 442-43) – to establish that the ALJ committed reversible error. The plain language of Ruling 96-6p reveals that when presented with the second situation, an ALJ retains some discretion to determine whether – "in the opinion of" the ALJ – the additional medical evidence may change the state agency medical source's finding at Step three. 1996 WL 374180 at *4. In the present case, although the record did not contain Plaintiff's March 6, 2007 MRI report

when Dr. Villanueva conducted his review, on April 13, 2007, Dr. Derrow noted that he had reviewed all of the evidence in the administrative file and that he agreed with Dr. Villanueva's assessment. (Tr. 341). Presumably, therefore, Dr. Derrow reviewed Plaintiff's March 6, 2007 MRI report when forming his opinions.

And, even if Dr. Derrow did not consider the March 6, 2007 MRI report, the report itself is somewhat equivocal. It states, "The disc protrusion abuts the traversing S1 nerve root and could be a means of irritation of the left S1 nerve root." (Tr. 443). Since this impression raised only a possibility that the bulging disc could cause S1 nerve root irritation, the ALJ was within his discretion under Ruling 96-6p not to obtain an updated medical opinion.

Accordingly, Plaintiff's second challenge to the ALJ's decision lacks merit.

**C.    Sentence Six Remand**

Plaintiff contends that a remand pursuant to Sentence Six of 42 U.S.C. §405(g)[7] is warranted due the existence of new material evidence he submitted to the Appeals Council after the ALJ closed the record. The additional evidence Plaintiff relies on concerns (1) his head injury and treatment following his February 2008 motor vehicle accident, and (2) his August 2008 lumbar MRI and Dr. Balturshot's records.

The Commissioner argues that the Plaintiff has not met his burden of showing that a Sentence Six Remand is appropriate.

The evidence Plaintiff submitted to the Appeals Council, but not the ALJ, "cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). This Court can, however, remand the case for

---

[7] Sentence Six of 42 U.S.C. §405(g) provides in part:

> The court may . . . at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding....

further administrative proceedings if the additional evidence satisfies the requirements of Sentence Six, 42 U.S.C. §405(g).  To justify a Sentence Six remand, Plaintiff bears the burden of showing that his additional evidence is both new and material.  *Longworth v. Commissioner of Soc. Sec.*, 402 F.3d 591, 598 (6th Cir. 2005).

"[E]vidence is 'new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting in part *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990).  Plaintiff must also show that there was good cause for not submitting the evidence to the ALJ.  *See Foster*, 279 F.3d at 587; *see also Cline*, 96 F.3d at 148.

The Commissioner contends that Plaintiff's additional evidence is not new because it existed before September 29, 2008, the date the ALJ issued his decision.  This would be correct except for one conundrum:  Plaintiff's additional evidence did not exist at the time of the ALJ's hearing but it did exist before the ALJ issued his decision.  It is, moreover, not clear whether the ALJ closed the record at the conclusion of the administrative hearing.  The ALJ stated at the conclusion of the hearing:

> So it appears that our record is complete after all and I'll now go on to re-evaluate the whole record in light of the testimony you've given today and then I'll make a new Decision on you claim....

(Tr. 42).  Construing these statements in Plaintiff's favor would require the conclusion that the ALJ closed the record at the conclusion of his hearing.  The additional evidence Plaintiff later obtained would therefore constitute new evidence.  In addition, if the ALJ closed the record, he effectively stopped Plaintiff from submitting any future evidence, thus establishing good cause for Plaintiff's failure to submit the additional evidence before the date the ALJ issued his decision.

Solving this conundrum is unnecessary, however, because Plaintiff has not shown that his post-hearing evidence is material.  "Such evidence is 'material' only if there is 'a reasonable probability that the [Commissioner] would have reached a different

disposition of the disability claim if presented with the new evidence.'"  *Foster*, 279 F.3d at 357 (quoting in part *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 711 (6th Cir. 1988)).

Plaintiff's evidence concerning the injuries he suffered during a motor vehicle accident and the treatment of his injuries is not material because it does not create a reasonable probability the ALJ would have reached a different conclusion.  The main reason for this is that the evidence tends to show that Plaintiff recovered well from his craniotomy.  Dr. Eichert characterized Plaintiff's brain CT on May 1, 2008 as "normal" and noted that Plaintiff's headaches "are resolved."  (Tr. 584).  And Dr. Eichert released Plaintiff from his care without restrictions.  *Id*.  Plaintiff asserts that it was unclear what his level of functioning was at that time.  This assertion, however, does not assist Plaintiff in showing materiality.  If the evidence does not make clear what Plaintiff's level of functioning was at that time, then it does not create a reasonable probability the ALJ would have changed his mind based on the new evidence.

The information provided in Plaintiff's August 2008 lumbar MRI was at best cumulative rather than new.  The MRI report indicates only the possibility that the disc bulging at L5-S1 was contacting the S1 nerve.  This was very similar, if not identical, to Plaintiff's March 2006 MRI, which stated that the disk protrusion abutting the S1 nerve "could be" the cause of the left S1 nerve root irritation.  (Tr. 443).  Such cumulative evidence, *compare* Tr. 443 *with* Tr. 603, does not support a Sentence Six remand.  *See Longworth*, 402 F.3d at 598; *Hensley v. Commissioner of Soc. Sec*., 214 Fed. Appx. 547, 551 (6th Cir. 2007).

Lastly, Dr. Balturshot's records merely document his ongoing treatment of Plaintiff, including his intent to obtain an MRI and an EMG.  These records tend to show that Plaintiff's condition remained the same or was, viewing them in Plaintiff's favor, aggravated or deteriorating.  *See, e.g.,* Tr. 602.  Such evidence does not create a reasonable probability that the ALJ would alter his non-disability conclusion.  *Sizemore*,

865 F.2d at 712 ("Evidence which reflected the applicant's aggravated or deteriorated condition is not relevant because such evidence does not demonstrate the point in time that the disability itself began. Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition.").

Accordingly, a remand under Sentence Six of 42 U.S.C. §405(g) is unwarranted.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The ALJ's decision be affirmed; and

2.      The case be terminated on the docket of this Court.


March 31, 2010                                    <u>     s/ Sharon L. Ovington     </u>
                                                          Sharon L. Ovington
                                                    United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).